IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| ROBERT ORWICK, | : | Case No. 1:20-cv-113 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| MERCY HEALTH, et al., | : | |
| Defendants. | : | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 26). Plaintiff filed a response in opposition to Defendants' Motion (Doc. 28), to which Defendant replied (Doc. 29). Thus, the motion is fully briefed and ripe for review. As explained below, Defendant's Motion for Summary Judgment is **GRANTED**.

### FACTS

In this matter, Plaintiff Robert Orwick ("Plaintiff") has sued his former employer, Defendant Bon Secours Mercy Health ("Mercy Health") and Crissie Tino, Plaintiff's supervisor, alleging that his termination was the result of disability discrimination. He has also asserted state law claims. Defendants contend that his termination was not discriminatory, but rather was the result of Plaintiff's admitted violation of a company policy prohibiting theft. Defendants contend that, in light of the evidence in the record, summary judgment is appropriate.

I.   **Plaintiff's Employment at Mercy Health**

Plaintiff's employment with Mercy Health began in October 2007 when he was hired as a full-time surgical assistant. (Robert Orwick Deposition ("Orwick Dep."), Doc. 17, Pg. ID 75-76.) Prior to this, Plaintiff served in the Navy and ultimately the Marines during Desert Shield and Desert Storm. (*Id.* at Pg. ID 81-84.)

At the beginning of his employment, Plaintiff signed a Certification stating, "I certify that I will comply with the Code of Responsibility and Standards of Responsible Conduct, and any other standards or policies by my organization, through my association with [Mercy Health]." (Orwick Certification to Comply with Code of Responsibility ("Certification"), Doc. 17-1, Pg. ID 313.) Plaintiff also signed an Employee Verification Statement, stating, "I have also read Mercy's Standards of Behavior, and I understand their importance in assuring a culture of excellence at our facilities. I pledge that I will conduct myself according to the Standards of Behavior and hold my colleagues accountable for following them as well." (*Id.* at Pg. ID 314.)

Mercy Health has a policy against employee theft. (Michael Kramer Deposition ("Kramer Dep."), Doc. 21, Pg. ID 868-69.) This policy states that employee theft is a terminable offense. (*Id.* at Pg. ID 869.) Whether an employee will be terminated due to theft is determined on a case-by-case basis, based on the specific events surrounding the theft. (*Id.*) Mercy Health has terminated other employees for theft of Mercy Health property prior to terminating Plaintiff. (*Id.*)

During his tenure at Mercy Health, Plaintiff was a well-respected surgical assistant and preferred by multiple doctors at Mercy Health. (Kim Auberger Deposition

2

("Auberger Dep."), Doc. 18, Pg. ID 582.) However, he did have some employment-related shortcomings, including being insubordinate by refusing to work in certain types of surgeries and speaking negatively about his co-workers, physicians, or Mercy Health policies and procedures. (*Id.* at Pg. ID 583-84.)

## II. Plaintiff's Medical History

Plaintiff experienced certain health issues, some of which required him to take medication. His health conditions included bipolar affective disorder, depression, moderate (HCC), post-traumatic stress disorder attributed to his military service, and anxiety. (Orwick Health Records, Doc. 17-1, Pg. ID 359.) Plaintiff also had low testosterone, which he treated through self-injections of testosterone hormones. (Orwick Dep., Doc. 17, Pg. ID 102; Orwick Health Records, Doc. 17-1, Pg. ID 361.) He had been administering the testosterone since December of 2017. (Orwick Health Records, Doc. 17-1, Pg. ID 361.) In fact, Plaintiff was on a regular treatment schedule and received a four-to-six-month advanced supply of syringes and needles for these injections. (Orwick Dep., Doc 17, Pg. ID 104.)

On June 18, 2018, Plaintiff had a psychiatric appointment with a Mercy Health practitioner. Plaintiff informed Kim Auberger, his direct supervisor, the day of his psychiatric appointment that he would need to take time off to attend his appointment. (June 18, 2018 Auberger and Orwick Text Chain, Doc. 17-1, Pg. ID 348.) On June 19, Plaintiff informed Auberger that he had been diagnosed with several conditions and prescribed a medication for treatment that would cause drowsiness. (*Id.* at Pg. ID 438; *see also* Auberger Dep., Doc. 18, Pg. ID 587-88.)

3

### III. Plaintiff's Termination

On Saturday, June 23, 2018, at approximately 8 A.M., Plaintiff realized that he did not have the necessary needle and syringe to inject himself with his testosterone hormone replacement treatment. (Orwick Statement Appealing Termination, Doc. 17-1, Pg. ID 438.) As a result, he drove twenty miles from his home to Mercy Health on his day off. (*Id.*; *see also* Orwick Dep., Doc. 17, Pg. ID 75, 89.) He did not clock in when he arrived at Mercy Health, nor at any time during that day. (Orwick Dep., Doc. 17, Pg. ID 89.) Nevertheless, he put his scrubs over his civilian clothes in the locker room. (*Id.* at Pg. ID 89-90.) He then proceeded from the locker room, through the breakroom, a substerile hallway, into a sterile room and through the "sterile core" while carrying a nonsterile box containing his used needles and syringes he brought from home. (*Id.* at Pg. ID 91-92, 94.) In the sterile core, he then took a sterile, unused syringe and needle, which was hospital property, and emptied his nonsterile, used syringes and needles into the "sharps container." (*Id.* at Pg. ID 94.) He then exited the sterile core, walked down the substerile hallway, and entered the locker room, where he injected himself with his testosterone hormone replacement treatment. (*Id.* at Pg. ID 94-95.) He then "recapped the needle and syringe, returned into the [sterile core] room and threw [the used syringe and needle] into the sharps container." (*Id.* at Pg. ID 95.) He then exited the hospital. (*Id.*)

Plaintiff never asked his supervisors or obtained permission to enter Mercy Health on his day off, walk through sterilized and restricted areas of the hospital, or take and use a Mercy Health syringe and needle. (*Id.* at Pg. ID 96-97.) Plaintiff testified that he intended to replace the syringe and needle he took from Mercy Health once his

4

prescription was filled. (*Id.* at Pg. ID 122.)

After leaving Mercy Health on June 23rd, Plaintiff texted Auberger saying:

Good morning and sorry to bother you[.] I want to be honest with you and tell you I had to use a syringe and needle from work. One of my meds I take, the supplies didn't come in. I will replace [the syringe and needle] once my syringes come in[.]

(June 23, 2018 Text Chain, Doc. 17-1, Pg. ID 351.)

Additionally, Candace Smith, one of Plaintiff's co-workers, informed Auberger she witnessed Plaintiff take the syringe and needle. (Candace Smith Deposition, Doc. 22, Pg. ID 942, 947.) Another coworker, Christi Stevens, also saw Plaintiff take the syringe and needle. (Christi Stevens Deposition, Doc. 23, Pg. ID 1002.)

Auberger was shocked to receive Plaintiff's text, so she immediately screenshotted Plaintiff's text and sent it to Defendant Cryssie Tino ("Tino"), Mercy Health's perioperative director and Auberger's superior. (Auberger Dep., Doc. 18, Pg. ID 577, 625-27). Tino contacted Kimberly Beisel, a member of the HR department at Mercy Health, who, in turn, informed Tino that she would reach out to Karyn Batdorf, the Mercy Health HR Director. ((Kimberly Beisel Deposition ("Beisel Dep."), Doc. 20, Pg. ID 767-68.) Beisel did so and Batdorf instructed Beisel to place Plaintiff on administrative leave. (Karyn Batdorf Deposition, Doc. 19, Pg. ID 711-12.)

Beisel and Tino contacted Plaintiff and placed him on administrative leave, informing him that he was to meet in Tino's office on Monday, June 25th, at 7:00 a.m., and that he was required to provide a written statement that explained his conduct prior to that meeting. (Beisel Dep., Doc. 20, Pg. ID 771-73.)

5

Also on June 23, Auberger reached out to Dave Hampton, a member of the security team at Mercy Health. (Auberger Dep., Doc. 18, Pg. ID 628-29); (Orwick Dep., Doc. 17, Pg. ID 245.) Hampton informed Auberger that when an individual "is found taking drug paraphernalia, which is a needle and syringe, is that it has to be reported to [the police]." (Auberger Dep., Doc. 18, Pg. ID 629.) Hampton later informed Auberger that Mercy Health security needed additional information regarding Plaintiff to provide to the Green Township police. (*Id.* at Pg. ID 630.) Auberger then heard directly from Jessica Grgas on behalf of Green Township asking for additional information regarding June 23 event. (*Id.* at Pg. ID 630-31.)

That same day, Auberger was contacted by Dr. Wright, a physician at Mercy Health, on behalf of himself and Dr. Busam. (Auberger and Tino Email June 24, 2018, Doc. 17-1, Pg. ID 346-47.) Dr. Wright explained to Auberger that Plaintiff was a former Navy veteran and potentially had PTSD. (*Id.*) Wright then explained that he was interested in what had occurred and what was going to happen to Plaintiff. (*Id.*) Wright explained he had reservations about terminating Plaintiff. (*See id.*) Wright then contacted Tino to discuss Plaintiff's situation as well. (Tino Dep., Doc. 24, Pg. ID 1063-66.)

Ultimately, Plaintiff was charged theft and arrested on that same day, June 23, in Hamilton County. (Hamilton County Municipal Court Journal entry Regarding Plaintiff's Arrest, Doc. 17-1, Pg. ID 352.) However, the charges were dropped by the Hamilton County Assistant Prosecuting Attorney on July 18, 2018. (*Id.* at Pg. ID 356.)

On Monday, June 25, Plaintiff met with Tino and Beisel. (Orwick Dep., Doc. 17, Pg. ID 211; Beisel Dep., Doc. 20, Pg. ID 775-76.) He did not bring a written statement to

6

the meeting, (Beisel Dep., Doc. 20, Pg. ID 776.) He informed Tino and Beisal that he did not believe Tino and Beisel showed compassion for Plaintiff's situation, and he did not think bringing a statement would do any good. (*Id.*) Beisel and Tino then moved forward with terminating Plaintiff's employment. (Tino Dep., Doc. 24, Pg. ID 1050; Beisel Dep., Doc. 20, Pg. ID 775-76.)

### IV. Plaintiff's Appeal of His Termination

Later that day, Plaintiff filed an Employee Appeal with Mercy Health, claiming that his termination was "extreme punishment for being honest." (Orwick Dep., Doc. 17-1, Pg. ID 357.) He explained that he required mental treatment and felt that he "had no other resource," that he "sadly made a mistake," and that he "[would] never make [the same mistake] again." (*Id.*) He stated that he did not steal the syringe and needle, but instead "[b]orrowed a syringe [and] needle to administer [his] meds, with full intent in replacing it once [his] supplies came in." (*Id.*) Instead of termination, Plaintiff proposed suspension and a final written warning. (*Id.*)

A Dispute Resolution Team ("DRT") reviewed Plaintiff's case and submitted a recommendation to Mercy Health's CEO. (DRT Recommendation, Exhibit 15 to Kramer Dep., Doc. 21, Pg. ID 900.) DRT's Recommendation, submitted on July 9, 2018, stated that "[p]er the Standards of Conduct and Performance policy, theft is a major infraction that may result in a final written warning or termination of employment." (*Id.*) However, DRT determined that, "[w]hile not a unanimous decision, the team would like to recommend [Plaintiff] be reinstated with a Final Written Warning and that the period of time since the infraction occurred be considered an unpaid suspension." (*Id.*)

7

Michael Kramer, Mercy Health's Chief Executive Officer, reviewed DRT's Recommendation. (Kramer Dep., Doc. 21, Pg. ID 834, 863.) After reviewing DRT's Recommendation, the case files, and meeting with Batdorf and Stephanie Meade, the chief nursing officer, it was Michael Kramer's decision to uphold Plaintiff's termination. (*Id.* at Pg. ID 863.)

## V.   Procedural History

After his termination was upheld, "Plaintiff filed a charge against Defendants with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC) for disability discrimination" in February of 2019. (Complaint ("Compl."), Doc. 1, Pg. ID 2.) The EEOC issued Plaintiff a Notice of Right-to-Sue on or about January 9, 2020. (*Id.*) Plaintiff subsequently filed this action within 90 days, bringing claims of: Count I - Disability Discrimination in violation of the American with Disabilities Act ("ADA"); Count II - Disability Discrimination in violation of Ohio Rev. Code § 4112.02; Count III – Defamation; Count IV - Malicious Prosecution; and Count V - Intentional Infliction of Emotional Distress. (*Id.* at Pg. ID 3-6.)

During litigation, Plaintiff dismissed Count I against Defendant Tino, individually, and Count III and Count IV in their entirety against both Defendants. (Amended Stipulation of Partial Dismissal of Action, Doc. 15, Pg. ID 58.) Accordingly, the remaining cause of actions are: Count I - Disability Discrimination in violation of the ADA against Mercy Health, Count II - Disability Discrimination in violation of Ohio Rev. Code § 4112.02 against both Defendants, and Count V - Intentional Infliction of Emotional Distress against both Defendants.

8

## LAW AND ANALYSIS

Courts must grant summary judgment if the record "reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). Once the movant has met its initial burden of showing that no genuine issue of material fact remains, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To do so, the nonmovant must present "significant probative evidence . . . on which a reasonable jury could return a verdict" in their favor. *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009).

The court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party." *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007). This requirement, however, does not mean that the court must find a factual dispute where record evidence contradicts wholly unsupported allegations. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (*citing Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). "If a moving party fulfills its burden of demonstrating that no genuine issue of material fact exists, the nonmoving party, to receive a trial, must present some significant probative evidence creating a factual dispute." *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597 (6th Cir. 2005).

9

I. **Defendants are Entitled to Summary Judgment on Plaintiff's Disability Discrimination Claims as a Matter of Law.**

Defendants allege that Plaintiff failed to make a prima facie case for disability discrimination, under either the ADA or Ohio law, that Defendant established Plaintiff's termination was due to a legitimate, nondiscriminatory reason, and that Plaintiff failed to establish such reason was pretextual. Additionally, Defendants claim that they are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim because Defendants' conduct was neither extreme nor outrageous. Plaintiff, on the other hand, claims that genuine issues of material fact exist as to all his remaining claims and so Defendants' Motion for Summary Judgment should be denied.

Plaintiff brings disability discrimination claims under both the ADA and Ohio's anti-discrimination statute, Ohio Rev. Code § 4112.02. However, because "Ohio disability discrimination law parallels the [ADA] in relevant respects," this Court may "appl[y] the same analytical framework, using cases and regulations interpreting the ADA as guidance in [its] interpretation of Ohio Rev. Code § 4112.02." *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015).

The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancing, or discharging of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff may establish a claim for disability discrimination through either direct or indirect evidence. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004). When, as in this case, a

10

plaintiff relies exclusively on indirect evidence, a court must apply the *McDonnell Douglas* burden-shifting framework. *See Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case. *Williams v. AT&T Mobility Serv. LLC*, 847 F.3d 384, 395 (6th Cir. 2017). To establish a prima facie case, Plaintiff must demonstrate "(1) [he] has a disability, (2) [he] is otherwise qualified for the position, with or without reasonable accommodation, (3) [he] suffered an adverse employment decision, (4) [his] employer knew or had reason to know of [his] disability, and (5) [he] was replaced or [his] position remained open." *Id.* If Plaintiff establishes a prima facie case, "the burden then shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* If Defendants satisfy this burden, Plaintiff must show "that the reason given by the employer was actually a pretext designed to mask unlawful discrimination." *Id.*

### A. The Court Assumes that Plaintiff Has Demonstrated a Prima Facie Case of Disability Discrimination.

Defendants argue that Plaintiff failed to establish a prima facie case because Plaintiff was not disabled at the time of his termination. First, Defendants claim that Plaintiff was not disabled when terminated because physical and mental impairments did not substantially limit one or more major life activities. Next, Defendants claim that Plaintiff was not disabled when terminated because there was no record of his impairment. Lastly, Defendants claim that Plaintiff was not regarded as disabled.

11

Defendants also claim that Plaintiff failed to establish a prima facie case because Defendants were not aware that he was disabled.

Plaintiff argues the contrary. Plaintiff claims that that he has established a prima facie case of disability discrimination. Plaintiff first argues that he had an actual disability based on his diagnosis of PTSD, Bipolar Disorder, Depression and Hypogonadism prior to his termination. He claims that the side effects to his diagnoses substantially impair major life activities, such as sleeping. Also, Plaintiff argues that his medical records corroborate his impairments and disabilities. Lastly, Plaintiff argues that Defendants were aware that he was disabled. This is because Plaintiff informed Auberger that he had been diagnosed with several conditions and prescribed a medication for treatment that would cause drowsiness on June 19, 2018. (*Id.* at 438; *see also* Auberger Dep., Doc. 18, Pg. ID 587-88.)

The Court, viewing the facts in a light most favorable to Plaintiff, acknowledges that the facts presented present a picture suggesting that Plaintiff established a prima facie claim for disability discrimination. However, the Court, without deciding that Plaintiff has satisfied his burden, will assume that a prima facie case has been established.

### B. Defendants Had a Legitimate, Nondiscriminatory Reason for Terminating Plaintiff.

Assuming that Plaintiff met his initial burden to establish a prima facie case of disability discrimination, "the burden then shifts to [Defendants] to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action." *Williams*, 847 F.3d at 395. Therefore, "[Defendants] must clearly set forth, through the

introduction of admissible evidence, reasons for [their] actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment decision." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). "[V]iolations of express company policy are legitimate, non-discriminatory reasons for taking adverse employment action." *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1061 (S.D. Ohio 2020) (citing *Blackshear v. Interstate Brands Corp.*, 495 F. App'x 613, 618 (6th Cir. 2012)).

Plaintiff admits that he violated a Mercy Health express policy when he took the syringes and needles. (Orwick Dep., Doc. 17, Pg. ID 94.) As Michael Kramer explained, theft is a violation of Mercy Health policies and is known as a terminable offense. (Kramer Dep., Doc. 21, Pg. ID 868-69.) And Plaintiff signed a certification promising to adhere to all Mercy Health policies. (Certification, Doc. 17-1, Pg. ID 313.)

Attempting to avoid this conclusion, Plaintiff argues that he did not steal the property, and thus did not violate any Mercy Health policies, because he intended to replace the property once his prescription was filled. (Plaintiff Response in Opposition, Doc. 28, Pg. ID 1584-85.) However, Plaintiff's intention does not erase the legal effect of his conduct, which fits the black letter definition of "theft." Theft is defined as "[t]he wrongful taking and removing of another's . . . property with the intent of depriving the true owner of it." *Theft*, Black Law Dictionary (11th Ed. 2019). Plaintiff took a Mercy Health syringe and needle without permission. While Plaintiff may have intended to provide Mercy Health with a different syringe and needle, he admittedly took Mercy Health property and disposed of it. (Orwick Dep., Doc. 17, Pg. ID 94-95.) This conduct

13

still constitutes theft because he intended to deprive Mercy Health of *those particular items*. Therefore, because Plaintiff violated Mercy Health's policy against theft, Defendants had a legitimate, nondiscriminatory reason to terminate Plaintiff.

### C. Defendants' Legitimate, Nondiscriminatory Reason was not Pretextual.

The burden next shifts to Plaintiff to demonstrate that Defendants' legitimate, nondiscriminatory reason was solely pretext for unlawful disability discrimination. To demonstrate pretext, Plaintiff must establish that the proffered reason "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558 (6th Cir. 2009). Additionally, "[P]laintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id*.

First, Plaintiff cannot prove that Defendants' reason has no basis in fact. Plaintiff has admitted that he, in fact, entered Mercy Health on June 23, his day off, entered multiple sterilized locations carrying an unsterilized box containing used syringes and needles while being unsterilized himself, disposed of the used syringes and needles in a sharps container, took a syringe and needle from Mercy Health without permission, and left. (Orwick Dep., Doc. 17, Pg. ID 91-94.) He then immediately confessed to such behavior by texting his supervisor. (June 23, 2018 Auberger and Orwick Text Chain, Doc. 17-1, Pg. ID 351.) Accordingly, Defendants' proffered reason for Plaintiff's termination clearly has a basis in fact.

14

Second, there is no genuine issue of material fact that the proffered reason actually motivated Defendants to terminate Plaintiff. Plaintiff was placed on administrative leave within hours of when he took the syringe and needles. (Karyn Batdorf Deposition, Doc. 19, Pg. ID 711-12.) His supervisors expressed shock moments after learning about the incident. (Auberger Dep., Doc. 18, Pg. ID 625-27.) Indeed, Defendants were informed by Mercy Health's head of security that, due to the nature of Plaintiff's conduct, Mercy Health's human resources department must contact Green Township police to report the theft. (*Id.* at Pg. ID 629-31.) Further, Mercy Health reacted by terminating Plaintiff only two days after the theft. (Tino Dep., Doc. 24, Pg. ID 1050; Beisel Dep., Doc. 20, Pg. ID 775-76.) Given the genuine reactions of Plaintiff's supervisors and the temporal proximity within which Mercy Health responded, the only reasonable conclusion is that Defendants terminated Plaintiff because of the theft.

Third, Defendants' proffered reason was sufficient to warrant Plaintiff's termination and was reasonable. Mercy Health has a policy against employee theft. (Kramer Dep., Doc. 21, Pg. ID 868-69.) Violation of this policy is a terminable offense. (*Id.*) Plaintiff signed a Certification and an Employment Verification statement, certifying that he would comply with and conduct himself as required by Mercy Health policies and standards of behavior. (Certification, Doc. 17-1, Pg. ID 313-14.) And Mercy Health has previously terminated other employees who violated the policy against employee theft. Kramer Dep., Doc. 21, Pg. ID 869.)

Although Mercy Health indicated that whether theft is terminable is based on the specific circumstances of the situation, (*see id.*), Plaintiff points to no facts to suggest that

15

his termination was the result of anything other than his behavior. As set forth above, Plaintiff's conduct was particularly troubling. Additionally, multiple sources within Mercy Health supported the decision to terminate Plaintiff, including the human resources director and the CEO. Further, the DRT's recommendation of reinstatement was not unanimous, and even DRT recognized that theft "is a major infraction" that could result in termination. (DRT Recommendation, Kramer Dep., Exhibit 15, Doc. 21, Pg. ID 900.)

Thus, the Court is not persuaded by Plaintiff's argument that Defendants proffered reason was solely pretextual. Plaintiff claims that a genuine issue of material fact exists as to whether Defendants' proffered reason was solely pretext, because "no one sought or considered Plaintiff's explanation" that he was not stealing the syringe and needle, but rather would replace the supplies once his prescription was filled. (Plaintiff Response, Doc. 28, Pg. ID 1584.) However, the Court finds such characterization to be a distinction without a difference. Common sense prevents the conclusion for which Plaintiff advocates, as to accept it would require hospitals to not sanction employees removal of drugs or drug paraphernalia so long as they intend to replace it. Such conduct by an employer would be reckless. Furthermore, Plaintiff points to no comments or alleged differential treatment that could conceivably relate to his disability—but for this single instance. Therefore, the Court finds that Defendants offered a legitimate, nondiscriminatory reason for the termination, and Plaintiff failed to establish that the reason was a pretext.

As a result, Defendants are entitled to summary judgment on Plaintiff's claims of

16

disability discrimination in violation of the ADA and in violation of Ohio Rev. Code § 4112.02, as a matter of law.

## II. Defendants are Entitled to Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim as a Matter of Law.

Next, Defendants argue that Plaintiff's intentional infliction of emotional distress claim fails as a matter of law. In Ohio, "a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was a proximate cause of plaintiff's serious emotional distress." *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1998). Because Defendants' conduct was not extreme and outrageous, Defendants are entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

"[C]onduct giving rise to an intentional infliction of emotional distress claim must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Long v. Ford Motor Co.*, 193 F. App'x 497, 503 (6th Cir. 2006) (quotations omitted). Indeed, Ohio courts narrowly define "extreme and outrageous conduct." *See Reamsnyder v. Jaskolski*, 10 Ohio St.3d, 150, 462 N.E.2d 392 (1984) (adopting the Restatement of the Law 2d, Torts (1965) definition of extreme and outrageous conduct.) Thus, "an employee's termination, even if based upon discrimination, does not rise to the level of extreme and outrageous conduct without proof of something more. If such were not true, then every discrimination claim would simultaneously become a cause of action

for the intentional infliction of emotional distress." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999).

Plaintiff's intentional infliction of emotional distress claim is premised on the fact that "Defendants' conduct . . . was outrageous and intended to cause Plaintiff severe emotional distress." (Compl., Doc.1, Pg. ID 6.) However, Plaintiff does not argue that any additional conduct other than Plaintiff's termination and Defendants' affirmance after Plaintiff's appeal (1) constituted extreme or outrageous conduct or (2) was a proximate cause of any of Plaintiff's alleged emotional distress. (*See* Plaintiff's Response in Opposition, Doc. 28, Pg. ID 1586-87.)

This Court found above that Defendants' conduct did not constitute discrimination on the basis of Plaintiff's alleged disability, and so Plaintiff's emotional distress claim must similarly fail. However, even if Defendants' conduct did rise to the level of discrimination, termination is not enough to satisfy the second element of intentional infliction of emotional distress under Ohio law unless additional conduct is identified, *see Godfredson*, 173 F.3d at 376, and Plaintiff points to no other conduct. In other words, Plaintiff's termination does not rise to the level of extreme and outrageous conduct under Ohio law. Thus, Defendants are entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**. Thus, Count 1 of Plaintiff's Complaint, Count 2 of Plaintiff's Complaint, and Count 5 of Plaintiff's Complaint are **DISMISSED WITH PREJUDICE**. Therefore, this case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: *[signature]*
JUDGE MATTHEW W. McFARLAND